**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 25-1429**

———————

WARNER ODIR GUEVARA MARTINEZ,

                    Petitioner,

        v.

TODD BLANCHE, Acting Attorney General,

                    Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued:  January 29, 2026                    Decided:  July 7, 2026

———————

Before WILKINSON, WYNN, and BERNER, Circuit Judges.

———————

Petition granted in part, denied in part; order vacated and remanded by published opinion. Judge Berner wrote the opinion, in which Judge Wynn joined. Judge Wilkinson wrote a dissenting opinion.

———————

**ARGUED:**  Ariel Alyssa Rosenbaum, COVINGTON & BURLING LLP, Washington, D.C., for Petitioner.  Jesse David Lorenz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  John J. Catalfano, Nicolle Wainer, COVINGTON & BURLING LLP, Washington, D.C., for Petitioner.  Brett A. Shumate, Assistant Attorney General, Holly M. Smith, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

BERNER, Circuit Judge:

Though the Executive Branch is responsible for administering our immigration system, federal courts play an important role in ensuring that applicants for relief from removal are afforded adequate procedural protections. This remains true even when an applicant for relief is deemed not credible.

Warner Odir Guevara Martinez was born in El Salvador and entered the United States without authorization. Seeking relief from removal, Guevara Martinez applied for asylum, withholding of removal, and protection from removal under the Convention Against Torture. Following a hearing, an immigration judge rejected all three applications. The immigration judge first found Guevara Martinez not credible. On the claims for asylum and withholding of removal, the immigration judge concluded that Guevara Martinez was statutorily ineligible because he had previously been convicted of a "particularly serious crime." The immigration judge also denied protection under the Convention Against Torture, finding that Guevara Martinez failed to show a sufficient likelihood that he would be tortured if he returned to El Salvador. Guevara Martinez sought review before the Board of Immigration Appeals, which affirmed the immigration judge's order in full. Guevara Martinez then petitioned for review by this court.

The immigration judge and the Board of Immigration Appeals failed to apply the proper legal test when analyzing whether Guevara Martinez was statutorily ineligible for asylum and withholding of removal relief because he had been convicted of a particularly serious crime. This error compels us to remand for further proceedings. Guevera

2

Martinez's remaining arguments, however, fail. Accordingly, we grant the petition in part and deny in part.

## I. Background

Petitioner Warner Odir Guevara Martinez is a native and citizen of El Salvador. He entered the United States without authorization in 2016. Several years later, he was placed in removal proceedings after the Department of Homeland Security charged him with being inadmissible. Guevara Martinez then sought relief from removal. He filed three applications: for asylum, for withholding of removal, and for protection from removal under the Convention Against Torture (CAT).

Asylum and withholding of removal both require an applicant to show persecution on account of a statutorily protected status. *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). "There are some differences: Asylum is discretionary, whereas withholding of removal is mandatory." *Id.* In line with this, the standard of proof for asylum is less stringent, requiring an applicant to show a well-founded fear of persecution. *Id.* The standard of proof for withholding of removal is higher, requiring that an applicant show a clear probability of persecution. *Id.* To demonstrate entitlement to protection under the CAT, an applicant must show that, if removed to a particular country, it is more likely than not that he would be tortured with the consent or acquiescence of that country's government. *Alfaro-Zelaya v. Bondi*, 157 F.4th 587, 593–94 (4th Cir. 2025). All three avenues of relief require the applicant to establish his eligibility, generally through

3

submission of application forms and supporting evidence. 8 U.S.C. §§ 1158(b)(1)(B) (asylum), 1231(b)(3)(C) (withholding of removal); 8 C.F.R. § 1208.16(c)(2) (CAT).

We begin by detailing the evidence that Guevara Martinez submitted in support of his applications. We then summarize the legal proceedings that followed.

### A. Facts Alleged in Guevara Martinez's Declaration

Guevara Martinez submitted a declaration in support of his applications for relief. In it, he recounts his alleged interactions with the Zetas, a Central American transnational drug cartel. Guevara Martinez's allegations are not simply farfetched. They can only be described as fantastical. Yet we begin by recounting what Guevera Martinez alleges occurred, as presented to the immigration judge.

Guevera Martinez first encountered the Zetas over fifteen years ago, while he was still living in El Salvador. He was approached by Luis Dias, a known member of the Zetas. Dias told Guevara Martinez that he was romantically interested in Guevara Martinez's sister. He also informed Guevara Martinez about a potential job opportunity in a mechanic's garage.

Dias invited Guevera Martinez to the garage to discuss the job. While there, Dias briefly stepped away to take a telephone call, and Guevara Martinez explored the garage. Guevara Martinez alleges that he "found coolers with human hearts and blood bags that kept the hearts alive." Parties' Joint Appendix (J.A.) 403. He believed the "hearts were being smuggled to the United States to be sold." *Id.* Following this gruesome discovery, Guevara Martinez turned down the job in the garage.

4

Sometime later, Guevara Martinez moved from El Salvador to Guatemala. There, he alleges that he was kidnapped by a group of Dias's associates from the Zetas. Certain that his kidnappers intended to kill him, Guevara Martinez began to pray. He recounts that the kidnappers were so moved by his commitment to God that they decided to set him free. They even gave him some money to take on his way.

After the kidnapping incident, while still in Guatemala, Guevara Martinez once again encountered Dias and his associates. Guevara Martinez claims that he was driving a motorcycle when Dias and the others began to chase him in a car. During the chase, Guevera Martinez "hit a car" and as a result "flew to the other side of the car," injuring his knee. *Id.* at 405. Guevara Martinez alleges that he then attempted to escape by "enter[ing] a house that was under construction" and "had only walls." *Id.* He "climbed the walls to escape," but his attackers fired a "bullet [ ] through two walls and hit [him] near [his] left calf muscle." *Id.* He "kept climbing to get out of the house through the ceiling to the next house when [he] was hit with a second bullet" in his right knee. *Id.* While he was scrambling away, he fell through the ceiling of a house, which coincidentally belonged to one of his friends. Guevara Martinez "fell down" from the ceiling and "almost [landed] on top of [his friend's] grandma's bed." *Id.* Guevara Martinez claims he "hid under the bed" until Dias and his associates finally left. *Id.* He later sought medical treatment for the gunshot wounds.

Years after these alleged altercations, Dias murdered Guevara Martinez's sister, with whom Dias had been romantically involved. Guevara Martinez believes that Dias

5

"killed [his sister] because she never told [Dias] that [Guevara Martinez] had come to the United States." *Id.* at 406.

The story does not end there. Guevara Martinez asserts that, in November 2023, "the Zetas with local criminals threw a rock through a window" of his family's home in Guatemala. *Id.* Attached to the rock was a letter threatening him and his family.

Most relevant to our discussion, Guevara Martinez also admits in his declaration that, sometime in 2023, he was convicted of committing assault and battery against a family member in the Commonwealth of Virginia. In describing the circumstances of the crime, Guevera Martinez admits that a violent altercation ensued after he discovered his romantic partner engaging in sexual activity with another man in their home. Guevara Martinez claims that after his discovery, his romantic partner began "pressing the birth control [device] on her arm." *Id.* He "told her to stop because it looked like she was hurting herself and put [his] arms around her to stop her." *Id.* Later, the police came and arrested Guevara Martinez.

## B. Procedural History

An immigration judge (IJ) held multiple hearings on Guevara Martinez's applications. Guevara Martinez testified and provided further details about his alleged encounters with Dias and the Zetas. The IJ also heard testimony from Professor Anthony Fontes, an expert on the country conditions in El Salvador and Guatemala. Fontes described the Zetas and how they operate in these countries. According to Fontes, the authorities in

6

El Salvador and Guatemala would be unable to protect Guevara Martinez from the Zetas should the transnational drug cartel seek to cause Guevara Martinez harm.

In addition to his declaration, Guevara Martinez submitted written materials to the IJ in support of his application. These included medical records, police reports, and letters of support from friends and family. In particular, the mother of Guevara Martinez's children submitted a letter explaining that "the same individual who killed [Guevara Martinez's] sister" "could [ ] target[ ]" Guevara Martinez if he returned to Guatemala. J.A. 779. Notably, she did not suggest that she or their children had been threatened by Dias or the Zetas.

For its part, the Government questioned Guevara Martinez about his 2023 conviction for assault and battery against a family member. The Government submitted a police report that contained officers' notes from conversations with witnesses, including Guevara Martinez, who described the facts surrounding the incident differently from Guevara Martinez's statements in his declaration. These notes say nothing about Guevara Martinez having discovered his romantic partner with another man. Rather, the notes indicate only that Guevara Martinez told the police at the time of the incident that he suspected his romantic partner had been unfaithful.

The notes further indicate that Guevara Martinez's romantic partner told the police that "Guevara Martinez grabbed her left tricep in a forceful manner" and threatened to "rip out" the birth control device implanted in her arm. *Id.* at 362. She reported that Guevara Martinez then "grab[bed] her hair and violently threw her to the ground." *Id.* The notes

7

further indicate that the responding police officer observed "fresh bruising" on Guevara Martinez's romantic partner's left arm. *Id.*

After having considered the materials submitted by Guevara Martinez and the evidence presented during the hearing, the IJ denied Guevera Martinez all forms of relief. The IJ first found Guevara Martinez not credible. He noted a number of Guevara Martinez's statements were inherently implausible, raising serious candor concerns. For example, the IJ found Guevara Martinez's story about having discovered beating human hearts "outlandish." *Id.* at 92. The IJ also found it "extremely unlikely that people who would kidnap . . . someone would release their captive for any reason, much less give him money," particularly in light of Guevara Martinez's other testimony regarding the ruthlessness of Dias and his associates. *Id.* The same was true of Guevara Martinez's testimony regarding the motorcycle chase and the shootings. The IJ found it "difficult to believe" Guevara Martinez's assertion that "he climbed up a wall of a house from the ground to the roof after withstanding a motorcycle crash and being shot twice, once in each leg." *Id.* Finally, in reaching his credibility determination, the IJ noted Guevara Martinez's testimony was inconsistent with certain statements in his declaration, particularly regarding the dates of the medical care he allegedly received after being shot.

Next, the IJ ruled that Guevara Martinez was barred from seeking asylum or withholding of removal because he had been convicted of a "particularly serious crime." In general, applicants for asylum and withholding of removal are ineligible for such relief if, "having been convicted by a final judgment of a particularly serious crime, [they are] a danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii) (asylum),

8

1231(b)(3)(B)(ii) (same, with respect to withholding of removal). The IJ concluded that Guevara Martinez's 2023 conviction for assault and battery against a family member under Virgina law qualified as such and thus relief could not be granted.

Finally, the IJ denied Guevera Martinez's request for protection under the CAT. The IJ concluded that Guevera Martinez did not meet his burden to demonstrate that it was "more likely than not" that he would "be tortured by, at the instigation of, or with the consent or acquiescence of public officials if he is returned to El Salvador." J.A. 106.

Guevara Martinez timely appealed the IJ's ruling to the Board of Immigration Appeals (BIA). He argued that the IJ erred in finding him not credible. He also asserted that the IJ failed to apply the correct legal test in determining that asylum and withholding of removal was barred due to a conviction for a particularly serious crime. Finally, he argued that the IJ's CAT determination was erroneous because the IJ gave undue weight to the adverse credibility finding and improperly discounted evidence of torture.

The BIA adopted and affirmed the decision of the IJ. Guevara Martinez then timely filed this petition for review.

## II. Analysis

Where, as here, the BIA adopts and affirms an immigration judge's decision and supplements it with its own reasoning, we review both decisions. *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014).

We first address the question of our jurisdiction, concluding that we may properly review the IJ's application of the particularly serious crime bar. Then, we hold that the IJ

failed to properly apply controlling BIA precedent in analyzing the particularly serious crime bar. Finally, we conclude that the IJ's credibility determination and ruling on CAT relief were sound. We take each of these matters in turn.

### A. Jurisdiction

We begin with the threshold question of jurisdiction. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 101 (1998). 28 U.S.C. § 1252(a)(2)(C)-(D) provides this court with jurisdiction over the legal issues in a petition for review, including challenges to an immigration judge's application of the particularly serious crime bar. *See Annor v. Garland*, 95 F.4th 820, 826 (4th Cir. 2024).

The Government argues that because the ultimate determination of the applicability of the particularly serious crime bar is "an unbounded judgment call," we are precluded from reviewing the reasoning of the IJ. Resp. Br. at 48. Not so. Even if we held that the ultimate determination of applicability of the particularly serious crime bar was a "discretionary determination[ ] of the BIA are not subject to review," we would "[n]evertheless[ ] . . . retain jurisdiction to review . . . questions of law" *de novo*. *Orellana v. Bondi*, 141 F.4th 560, 564 (4th Cir. 2025) (citing 8 U.S.C. § 1252(a)(2)(D)).[1] We have

---

[1] This case, like *Annor*, does not require us to review the agency's ultimate determination that Guevara Martinez was convicted of a particularly serious crime. 95 F.4th 826 n.2. We note that our sister circuits, applying the Supreme Court's decision in *Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020), have generally held that that determination is reviewable as "the application of a legal standard to undisputed or established facts." *Id.* at 225; *see, e.g.*, *Amos v. U.S. Att'y Gen.*, 157 F.4th 313, 323 & n.16 (Continued)

repeatedly affirmed that we possess jurisdiction to review a legal argument that the BIA failed to adhere to its own precedent. *Annor*, 95 F.4th at 826; *see also Hussen v. Bondi*, 135 F.4th 150, 159–160 (4th Cir. 2025). Because this is such a case, we have jurisdiction.

## B. Particularly Serious Crime Bar

An applicant is ineligible for asylum and withholding of removal if, "having been convicted by a final judgment of a particularly serious crime, [he] is a danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). This has come to be known as the "particularly serious crime bar." *Diahn v. Blanche*, 175 F.4th 291, 302 (4th Cir. 2026). We review legal challenges to an application of the particularly serious crime bar *de novo*. *Annor*, 95 F.4th at 826.

Some convictions are always considered particularly serious crimes. For asylum purposes, such convictions are those classified as aggravated felonies as listed under 8 U.S.C. § 1101(a)(43). For withholding of removal purposes, such convictions include aggravated felonies for which an applicant received an aggregate sentence of at least five years' incarceration. *Annor*, 95 F.4th at 826; 8 U.S.C. § 1231(b)(3)(B)(iv); 8 C.F.R. § 1208.16(d)(2)–(3). For all other offenses, however, the IJ must determine on an individualized "case-by-case basis" whether the applicant's conviction is sufficiently serious so as to be considered a "particularly serious crime." *Annor*, 95 F.4th at 826

---

(3d Cir. 2025); *Kentucky v. U.S. Att'y Gen.*, 43 F.4th 1175, 1187 (11th Cir. 2022) (collecting cases).

11

(quoting *In re B-Z-R-*, 28 I & N Dec. 563, 563 (A.G. 2022)). In making this assessment, IJs are required to apply a two-step test to ask: "(1) whether the elements of the offense bring it within the ambit of a particularly serious crime; and if so, (2) whether the individual facts and circumstances confirm that the offense is particularly serious." *Id.* at 827 (internal quotation marks omitted) (citing *Matter of N-A-M-*, 24 I & N Dec. 336 (BIA 2007)). These steps must be taken in order, with the elements of the crime evaluated *before* consideration of the facts. *Id.*

Guevara Martinez's 2023 conviction for assault and battery against a family member, pursuant to Virginia Code Section 18.2-57.2, is a misdemeanor, not an aggravated felony, and he was sentenced to less than five years' incarceration. *See* 8 U.S.C. §§ 1101(a)(43), 1231(b)(3)(B)(iv); 8 C.F.R. § 1208.16(d)(2)–(3). The IJ was, therefore, required to apply the individualized two-step test. *Annor*, 95 F.4th at 826. The IJ failed to do so.

On the first step, the IJ did not meaningfully analyze the elements of the crime of assault and battery against a family member under Virginia law. Instead, the IJ concluded summarily, without reasoning, that "the elements of the offense fall within the ambit of a particularly serious crime." J.A. 169 (oral pronouncement); *see also* 101–03 (written decision). The IJ then proceeded to step two and described the facts of Guevara Martinez's 2023 conviction in detail. After describing these facts, the IJ concluded that "[b]ecause the statute of conviction is a crime against a person, the elements 'potentially bring the crime within the ambit of a particularly serious crime.'" J.A. 102 (quoting *N-A-M-*, 24 I. & N. Dec. at 343).

12

*Annor* makes clear that such analysis cannot suffice. 95 F.4th at 827–29. In *Annor*, the court vacated and remanded an order denying relief from removal because the BIA analyzed the elements of an incorrect statute. Rather than assessing the statute under which the petitioner was convicted, it analyzed a different statute altogether. *Id.* The BIA's failure to conduct the step one ambit determination was reversible error. This court also cited with approval *Ojo v. Garland*, 25 F.4th 152 (2d Cir. 2022), in which the Second Circuit "vacated a particularly serious crime finding where the IJ merely observed that the offense at issue was 'a crime against persons' without considering its elements at all, and the BIA affirmed that finding without further analysis." *Annor*, 95 F.4th at 827 (citing *Ojo*, 25 F.4th at 165–66). Similarly here, the IJ did not sufficiently explain why the elements of assault and battery against a family member under Virginia law fall within the ambit of a particularly serious crime: the same defect that existed in *Annor* and *Ojo*.

Even the limited analysis offered by the IJ—noting that the statute of conviction involves a crime against a person—came too late. The IJ made this observation only *after* a prolonged discussion of the particular facts of this case, contrary to the order required by BIA precedent. Rather, BIA precedent requires the IJ to analyze each step, first elements then facts, in sequential order. *Annor*, 95 F.4th at 828–29. The IJ's swapping of steps was improper.

"Although the BIA possesses wide latitude to make 'particularly serious crime' determinations under 8 U.S.C. § 1231(b)(3)(B)(ii), it must do so in accordance with its own precedent." *Id.* at 831. That did not occur here. Accordingly, we vacate the BIA's decision and remand for further proceedings consistent with this opinion. *See Orellana*, 141 F.4th

13

at 566 (explaining that when an agency fails to follow its binding procedures, the "agency's actions are generally invalid"). The BIA may very well reach the same end conclusion: that Guevara Martinez's 2023 conviction for assault and battery against a family member under Virginia law qualifies as a particularly serious crime, thus rendering him statutorily ineligible for asylum or withholding of removal relief. In assessing Guevara Martinez's applications, however, it may not act contrary to law and flout its own precedents. *Mouns v. Garland*, 113 F.4th 399, 412 (4th Cir. 2024).

## C. Credibility Determination

Guevara Martinez also challenges the determination that he is not credible. We review an immigration judge's credibility determination with deference to determine whether it was supported by substantial evidence. *Hui Pan v. Holder*, 737 F.3d 921, 926 (4th Cir. 2013). Thus, we ask whether the record "contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol Edison Co.*, 305 U.S. at 229).

In making an adverse credibility determination, an immigration judge must consider the totality of the circumstances. *Hui Pan*, 737 F.3d at 928. An immigration judge may take into consideration many factors, including "the demeanor, candor, or responsiveness of the applicant or witness," as well as "the inherent plausibility of the applicant's" account. *Herrera-Alcala v. Garland*, 39 F.4th 233, 245 n.10 (4th Cir. 2022) (quoting 8 U.S.C.

14

§ 1158(b)(1)(B)(iii)). An immigration judge must support an adverse credibility finding with "non-speculative, 'specific, cogent reasons.'" *Hui Pan*, 737 F.3d at 928 (quoting *Dankam v. Gonzalez*, 495 F.3d 113, 120–21 (4th Cir. 2007)).

It is abundantly clear that the IJ's adverse credibility determination here was supported by substantial evidence. The IJ detailed "specific, cogent reasons" supporting its adverse credibility finding. *Hui Pan*, 737 F.3d at 928 (quoting *Dankam*, 495 F.3d at 120–21). Guevara Martinez argues that the adverse credibility determination improperly rested on minor inconsistencies between his testimony and other record evidence. Not so. The IJ catalogued specific implausible claims in Guevara Martinez's testimony and declaration on the basis of which a reasonable person could most certainly find Guevara Martinez not credible. *See Biestek*, 587 U.S. at 103.

Guevara Martinez further contends that the IJ's credibility determination cannot withstand scrutiny because the IJ "violated his right to due process by failing to afford him the opportunity to explain purported inconsistencies in his testimony." Opening Br. at 31. He identifies a single exchange between himself and the IJ in support. During the hearing, the IJ asked Guevara Martinez questions, and instructed Guevara Martinez not to provide "a detailed explanation" but rather to answer "yes or no." J.A. 302. When Guevara Martinez nevertheless responded with greater detail, the IJ threatened to find Guevara Martinez "unresponsive." J.A. 303.

"We review de novo a claim that the procedures utilized in [immigration] hearings contravened due process or the INA." *Rusu v. I.N.S.*, 296 F.3d 316, 320 (4th Cir. 2002). To succeed on such a claim, an applicant must show both a violation of his rights—that he did

15

not have "the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 321—and that there was "prejudice resulting from" the violation, *id.* at 324. Guevara Martinez cannot do so here. The IJ provided Guevara Martinez with meaningful opportunities to explain himself and to develop the factual record. We also cannot say that this exchange prejudiced Guevara Martinez in a manner that impacted the results of the proceedings because the IJ's credibility determination is amply supported by the record. *Id.* at 320; *see also Ayala-Osegueda v. Garland*, 92 F.4th 220, 236 n.11 (4th Cir. 2024).[2]

Accordingly, we affirm the IJ's adverse credibility finding.

## D. Convention Against Torture

Finally, Guevera Martinez contends that the IJ erred in concluding that he was not entitled to relief under the CAT. We review the denial of CAT relief for abuse of discretion. *McDougall v. Bondi*, 150 F.4th 637, 641 (4th Cir. 2025). An immigration judge abuses his discretion by committing a legal error, ignoring relevant evidence, or failing to offer a reasoned explanation for his decision. *Id.* Moreover, we review factual findings for

---

[2] Guevara Martinez cites *Islam v. Gonzales*, 469 F.3d 53 (2d Cir. 2006) in support of his argument. In *Islam*, the Second Circuit explained that "when an IJ's conduct results in the appearance of bias or hostility such that we cannot conduct a meaningful review of the decision below, we remand." *Id.* at 55. The isolated exchange in this case is distinguishable from the circumstances in *Islam*. There, an IJ analogized "Islam's petition for asylum to a fictional petition that Terry Nichols, the Oklahoma City bomber, might file if he applied for asylum in Bangladesh and claimed that he was persecuted in America." *Id.* at 55 n.1 The IJ "repeatedly interrupted Islam when he spoke, did not always allow him to explain what he meant, and sparred and argued with him[.]" *Id.* at 56.

16

substantial evidence, including an immigration judge's determination of what is likely to occur if a petitioner is removed to a particular country. *Id.*

An applicant for CAT relief must demonstrate that it is more likely than not that he would be tortured if removed to the proposed country of removal. *Portillo Flores v. Garland*, 3 F.4th 615, 637 (4th Cir. 2021) (en banc). An applicant must further show that the torture "will occur at the hands of government or with the consent or acquiescence of government." *Alfaro Zelaya*, 157 F.4th at 593–94 (quoting *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012)). Guevara Martinez asserts he is likely to be tortured in El Salvador by Dias and the Zetas as well as the Salvadoran government. The IJ concluded that Guevara Martinez failed to meet his burden as to these claims. In so concluding, the IJ's factual findings were supported by substantial evidence. There is nothing in the record to suggest that the IJ otherwise abused his discretion.

### (i) Dias and the Zetas

On the question of whether it was more likely than not that Guevara Martinez would be tortured by Dias and the Zetas if he returned to El Salvador, the IJ noted that Guevara Martinez had not directly encountered Dias or any of his associates for more than eleven years. Moreover, the IJ's credibility determination—which we have upheld—further weakened Guevara Martinez's claim of likely torture. The IJ's finding that Guevara Martinez was unlikely to be tortured by Dias and the Zetas was therefore supported by substantial evidence.

Guevara Martinez argues that the IJ abused his discretion by failing to take into consideration the rock with a threatening letter that had allegedly been thrown through the

17

window of Guevara Martinez's family's home in 2023. He contends that this letter is evidence of Dias's continuing intent to harm him. The IJ did not ignore the letter, however. Rather, the IJ discounted it based on specific reasons supported by the record, including the lack of credible substantiation of the source, timing, and authenticity of the letter. The IJ acted within his discretion in affording the letter no weight.

Guevara Martinez also argues that the IJ abused his discretion by failing to consider the declaration and testimony of Professor Fontes, Guevara Martinez's expert witness. Professor Fontes explained that, although Salvadoran authorities have managed to combat gang violence committed by groups like MS-13, such efforts have had little impact on transnational drug cartels such as the Zetas. The IJ found Dr. Fontes credible, credited this testimony, and noted its relevance. The IJ determined, however, that Professor Fontes's conclusion regarding the likelihood that Guevara Martinez himself would be tortured was not probative because it was based upon Guevara Martinez's own account of his encounters with the Zetas. This was the same account the IJ found not credible. The IJ also found the Government's evidence regarding likelihood of torture persuasive. The IJ thus adequately explained his conclusion and treatment of the evidence, including Professor Fontes's expert opinion.

### (ii) The Salvadoran government

On the question of whether it was more likely than not that Guevara Martinez would be subjected to torture by the Salvadoran government were he to return to El Salvador, the IJ's conclusion was also supported by substantial evidence. An applicant can meet his burden by identifying "a hypothetical chain of events" that is more likely than not to "come

18

together to result in the probability of torture." *Lopez Sorto v. Garland*, 103 F.4th 242, 253 (4th Cir. 2024) (quoting *In re J-F-F-*, 23 I & N Dec. 912, 917–18 (A.G. 2006)). Guevara Martinez points to the country conditions in El Salvador, explaining that the Salvadoran government enacted a state of exception—meaning a pause of constitutional and civil rights—and authorized security forces to conduct mass arrests of individuals with alleged connections to gangs. Guevara Martinez argues that, in this environment, the Salvadoran government could well mistake him for a gang member, arrest him arbitrarily, and subject him to torture.

The IJ found that Guevara Martinez failed to establish that this hypothetical chain of events was more likely than not to occur. This factual finding was supported by substantial evidence. The IJ acknowledged Guevara Martinez's evidence suggesting that "Salvadoran society stigmatizes male deportees as suspected gang members" and indicating that Salvadoran officials have been known to arrest such men "based on perceived gang membership of innocent persons." J.A. 107. The IJ concluded, however, that "the arrest and torture of innocent people similarly situated" to Guevara Martinez "is not so common that it will more likely than not happen to him." J.A. 108.

Guevara Martinez has identified no error in this finding. He simply points to contrary evidence in the record. Because the IJ thoroughly considered the record evidence and explained the reasoning for his conclusions, the IJ acted within his discretion. *See Ibarra Chevez v. Garland*, 31 F.4th 279, 292–93 (4th Cir. 2022).

19

## III. Conclusion

For the reasons above, we grant in part and deny in part Guevara Martinez's petition for review. We vacate the order of the BIA and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED IN PART, DENIED IN PART;*
*ORDER VACATED AND REMANDED*

WILKINSON, Circuit Judge, dissenting:

Warner Odir Guevara Martinez illegally entered the United States. When the government sought to remove him, he requested asylum and withholding of removal. The Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") denied relief, and for good reason: His version of events is in equal parts extraordinary and preposterous, featuring the haphazard trafficking of human hearts, a divine intervention at the brink of death, and a *Terminator*-style motorcycle chase. He also paints himself as the misunderstood victim in his own convictions for throwing his partner to the ground by her hair, punching the back of her head, threatening to rip out her contraceptive implant, repeatedly blocking her efforts for help, and trying to abscond with their daughter. Reviewing these remarkable claims and more, the agency held that Guevara Martinez "failed to meet his burden of proof."

The majority disputes none of this. Yet it vacates and remands anyway, claiming the agency failed to properly apply its own case law when determining whether Guevara Martinez's domestic violence qualified as a "particularly serious crime." Since his tall tales already doom his asylum and withholding claims, it is simply not relevant what kind of crime he committed. Even if it were somehow relevant, the IJ and BIA correctly concluded from the factual record that Guevara Martinez's brutal assault on a family member was a particularly serious crime. The remand here is thus wholly gratuitous. Because we do not require process for the sake of process, I respectfully dissent.

21

I.

Guevara Martinez entered the United States illegally. He can stay here only if he qualifies for asylum or withholding of removal. For both claims, an alien must show persecution based on a statutorily protected status. 8 U.S.C. §§ 1101(a)(42)(A), 1231(b)(3)(A). In his attempt to do so, Guevara Martinez says he experienced a series of fantastical events demanding both the utmost suspension of disbelief and a disregard for every part of the record that contradicts him. As the majority agrees, these chimerical accounts do nothing to support granting him relief from removal. They therefore provide a standalone ground to deny his petition and warrant retelling.

A.

Generally, an alien's story must be "inherent[ly] plausib[le]" to justify asylum or withholding of removal. *Id.* § 1158(b)(1)(B)(iii); *see also id.* § 1231(b)(3)(C). Guevara Martinez's testimony and evidence are anything but.

For instance, during a job interview in El Salvador, he purportedly discovered that his interviewer, Luis Fernando Dias, had a cooler of human hearts in the room kept beating by pacemaker-type devices running off a semitruck's engine. This would be quite the medical and engineering feat, especially since nothing indicates Dias had any specialized knowledge in either field. Equally remarkable is that these organs were apparently headed to Arizona for sale. Most hearts, even when stored using much more sophisticated medical devices, "can only survive outside the body for four to six hours." Health Res. & Servs. Admin., Dep't of Health & Hum. Servs., *Matching Donors and Recipients* (Apr. 2021). A

22

direct flight from El Salvador to Arizona alone lasts over four hours. Surely Dias would not squander any more precious time conducting a job interview.

Guevara Martinez's attested Guatemalan escapades are even more absurd. He states that two men, working for the same boss as Dias, cut his hands with a knife and pistol-whipped his head until he lost consciousness. They then allegedly held Guevara Martinez captive for three days without food or water, eventually revealing their intention to strangle him. Right before his scheduled execution, however, Guevara Martinez says he prayed for two minutes. In an unbelievable twist of fate, one of the men felt so moved by Guevara Martinez's faith that he not only released him, but also gave him money and a blessing.

Unsurprisingly, this deus ex machina suffers from several glaring plot holes. Why would such a ruthless torturer, after three days of sheer brutality at the behest of Dias's bloodthirsty leader, suddenly experience a change of heart from a brief prayer? And what happened to the torturer's coconspirator? Did he too experience a dramatic bout of repentance?

The climax of the story is just as fictitious. According to his written declaration, Guevara Martinez was motorcycling when Dias and some henchmen approached in two cars. A chase ensued, during which the assailants continuously shot at him. They eventually trapped Guevara Martinez in a dead end, causing him to collide with one of their cars and fly off his motorcycle. Despite injuring his knee, Guevara Martinez ran into a nearby house under construction and began scaling one of its walls. A bullet then struck his left calf. With superhuman grit, Guevara Martinez kept climbing. He eventually reached the top and jumped onto a house next door. But when a second bullet struck his right knee, he fell

23

through the roof. Miraculously, that home happened to be owned by a female acquaintance. So Guevara Martinez hid under her grandmother's bed. Dias, who had somehow gained entry, could not find him after a half-hour search because there were "a ton of things underneath her bed" and "blood was pooled in [Guevara Martinez's] boots" such that he left no trail. J.A. 405. Once Dias left, the female acquaintance purportedly removed a bullet from Guevara Martinez's left calf, and some friends later picked him up.

Here too plot holes riddle the narrative. How could anyone climb a wall after being thrust from a motorcycle and shot in the leg? Why did the roof collapse when Guevara Martinez was shot a second time? What are the chances this home would be owned by an acquaintance? Why would the assailants not move the things underneath the bed in the only room with a hole in its ceiling? And why did the wound in Guevara Martinez's right knee, which he claims needed thirty-six stiches, not leave blood? Were his boots knee high?

Of course, none of this ever happened. Guevara Martinez would have us believe he is something of a real-world Indiana Jones, repeatedly defying death through mystical stunts and a healthy dose of luck. Dias, meanwhile, operates as a sort of sophisticated villain, albeit one who suffers gaffes rivaling those of the cat in *Tom and Jerry*. Because neither the IJ nor the BIA needs to throw out common sense when assessing credibility, we can readily deny the petition on the basis that Guevara Martinez's screenplay is too far-fetched to be true.

## B.

Compounding the implausibility of Guevara Martinez's story is its total lack of "consistency" across the record. 8 U.S.C. § 1158(b)(1)(B)(iii); *see also id.* § 1231(b)(3)(C).

24

For example, while Guevara Martinez twice complained to foreign authorities after the dates of his alleged kidnapping and shooting, neither police report names Dias or Los Zetas (the drug-trafficking organization with whom Dias was purportedly affiliated) as the culprit. Both instead specify that MS-13 attacked him after he refused to join it. The police reports also make no mention of him being tortured, kidnapped, or chased by car.

Guevara Martinez tries to reconcile these problems by explaining that the authorities intentionally misattributed the incidents to MS-13 given their fear of Dias and Los Zetas. If that were true, one wonders why the police would bother filing a report at all, let alone falsely blame a gang as dangerous as MS-13. That police in two distinct jurisdictions tendered this same bizarre response, as Guevara Martinez claims, is even more ridiculous.

Indeed, contradicting the police is a theme in Guevara Martinez's testimony. When downplaying his two Virginia convictions, he could not have painted himself in a more sympathetic light. He tells a tragic tale of waking up to his partner having sex with his nephew. Upon confrontation, she purportedly bruised herself on purpose (by pressing on a contraceptive implant in her arm) and then called the police to report domestic abuse, despite Guevara Martinez begging her not to do so given the risk he would be deported. He also maintains that he merely hugged his partner to stop her from hurting herself.

A contemporaneously created police report tells things quite differently. It recounts how a police officer, upon responding to the partner's domestic violence complaint, saw Guevara Martinez forcibly grab her arm to pull her away from the entryway. So the officer detained him and questioned both parties. According to the partner, Guevara Martinez had earlier grabbed her arm forcefully; threatened to rip out a contraceptive implant in it,

25

thinking the implant was used to mask infidelity; and "violently threw her to th[e] ground" by her hair. J.A. 362. The officer noticed "fresh bruising" on her arm that "w[as] dark purple" and "in the shape of fingerprints." J.A. 362. Guevara Martinez, for his part, denied any physical altercation but suspiciously omitted several exculpatory—and presumably unforgettable—claims that later appeared in his testimony. For example, he failed to tell the officer that he supposedly woke up to his partner having sex with his nephew and that his partner apparently bruised herself.

The inconsistencies do not end there. Guevara Martinez attests that, after being released from custody and served with a protective order, he returned home with his partner's consent so that he could peacefully gather his belongings, only to be greeted by her and her family yelling at him to leave. But according to another police report, Guevara Martinez used a key to enter and proceeded to assault his partner's niece, punch his partner in the back of her head, steal her phone, and try to flee with their daughter, all while he was allegedly high on PCP.

## C.

Riddled with incredible claims and bald contradictions, Guevara Martinez's story is as unconvincing as it gets. Substantial evidence thus easily supports the decisions of the IJ and BIA. Remember, the record as a whole need only support their adverse credibility determination by "more than a mere scintilla" of evidence. *Urias-Orellana v. Bondi*, 146 S. Ct. 845, 850 (2026) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). And since Guevara Martinez's independent evidence comes nowhere near the "almost insurmountable" burden needed for relief without credibility—a conclusion the majority

26

does not dispute—we must deny his petition. *Herrera-Alcala v. Garland*, 39 F.4th 233, 251 (4th Cir. 2025) (quoting *Rusu v. INS*, 296 F.3d 316, 323 (4th Cir. 2002)).

## II.

The majority does not even try to suggest that Guevara Martinez is telling the truth. It instead opts to fault the IJ and BIA for, ostensibly, failing to follow their own precedent when assessing whether Guevara Martinez committed a "particularly serious crime." That conclusion is both surprising and incorrect for several reasons.

## A.

To state the obvious, an alien who unlawfully enters the United States, as Guevara Martinez did, is subject to removal. He does not need to separately break the law after his act of illegal immigration. The particularly serious crime bar is but an independent ground to deem an alien ineligible for asylum and withholding of removal—if he otherwise qualifies for such relief on the merits. *See, e.g.*, *Pagayon v. Holder*, 675 F.3d 1182, 1190–91 (9th Cir. 2011) (per curiam) (denying petition for review for alien who "failed to meet his burden of pro[of]" without discussing "the IJ's alternative conclusion" about the alien's particularly serious crime). And because Guevara Martinez does not qualify for asylum or withholding on the merits, he can be removed. This straightforward observation should end the case.

The majority seems to think that the IJ and BIA denied asylum and withholding of removal solely on the basis that Guevara Martinez committed a particularly serious crime. If true, that means we cannot decide this petition on another ground. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). However, the decisions below reveal the very opposite: over

27

and over again, the agency denied Guevara Martinez's claims first on the merits and second on the particularly serious crime bar.

Recall the IJ's decision, which the BIA adopted in full. After spending several pages spelling out the many reasons why Guevara Martinez's claims lacked credibility and corroboration, the IJ twice wrote in connection with the asylum and withholding claims that "[Guevara Martinez] failed to meet his burden of proof and persuasion." J.A. 99–100. He did so without mentioning the words "particularly serious crime" even once; rather, the discussion of Guevara Martinez's conviction came only afterward in a discrete, separately designated portion of the opinion. J.A. 100–03. And in a concluding paragraph, the IJ again explained that "[Guevara Martinez] failed to meet his burden of proof and persuasion as he was not credible and failed to adequately corroborate his claim." J.A. 109. The IJ then added "further" that Guevara Martinez was ineligible for relief due to his crime of domestic violence. J.A. 109.

By "further," of course, the IJ meant that the particularly serious crime bar was an independent, but not a necessary, basis to deny relief. This is made readily apparent by the word's ordinary meaning. *See, e.g.*, *Further*, The American Heritage Dictionary of the English Language 713 (5th ed. 2011) ("In addition; furthermore.").

It is also made readily apparent by the IJ's findings as to the burden of proof. For both asylum and withholding of removal, of course, the alien bears the burden. 8 U.S.C. § 1158(b)(1)(B)(i) ("The burden of proof is on the applicant . . . ."); *id.* § 1231(b)(3)(C) ("[T]he trier of fact shall determine whether the alien has sustained the alien's burden of proof . . . ."). So by repeatedly stating that Guevara Martinez "failed to meet his burden of

28

proof," the IJ necessarily denied Guevara Martinez's claims for asylum and withholding of removal. And again, the IJ did so entirely based on the unbelievable and uncorroborated nature of his story. The particularly serious crime bar never entered the equation.

What exactly does the majority think will happen upon remand? The IJ and BIA have already explained that Guevara Martinez's claims are unpersuasive, and the majority agrees with them on this front. Even if the agency decides—unnecessarily—to reevaluate its analysis of Guevara Martinez's domestic violence conviction, it will still be bound by our holding that he lacks credibility and corroboration. After all, an "adverse credibility determination and the lack of corroboration doom [an alien's] claims." *Omowole v. Garland*, 6 F.4th 734, 743 (7th Cir. 2021). Ultimately, the majority does nothing but delay the inevitable administration of justice. But "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

B.

The majority nevertheless debates whether Guevara Martinez's conviction for assault and battery against a family member was a "particularly serious crime" such that he poses "a danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). That analysis would remain flawed even if it served some discernible end.

Under our normal totality-of-the-circumstances test, this issue should have been easy. Guevara Martinez violently threw his partner down by her hair and threatened to remove a contraceptive implant inside her arm. Worse still, he denies guilt to this day,

29

portraying himself instead as a saintly figure ruthlessly victimized by an unfaithful and deportation-seeking romantic partner. That narrative is ludicrous if not offensive.

With this in mind, "the circumstances and underlying facts of [Guevara Martinez's] conviction" show he committed a particularly serious crime. *Gao v. Holder*, 595 F.3d 549, 557 (4th Cir. 2010) (quoting *In re Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982)). And "most importantly, . . . the type and circumstances of [his] crime indicate [he] will be a danger to the community." *Id.* (quoting *In re Frentescu*, 18 I. & N. Dec. at 247). If Guevara Martinez is willing to commit and deny such disturbing violence against his romantic partner (the mother of his daughter, no less), one can fairly conclude that he poses a danger not just to her and her family, but to society. *See, e.g.*, *United States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011) ("[T]he rate of recidivism among domestic violence misdemeanants is substantial . . . .").

The record thus confirms the obvious: the IJ and BIA rightly concluded that Guevara Martinez, by violently abusing and threatening his partner while cutting her off from help, committed a particularly serious crime. Moreover, any layman familiar with the circumstances of Guevara Martinez's crimes would say he poses "a danger to the community." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). Only lawyers could think otherwise.

C.

Thinking otherwise, the majority faults the agency for failing to sufficiently expound upon the first half of the supposed "two-step test" for identifying a particularly serious crime. Maj. Op. at 12. That is, the IJ and BIA apparently failed to scrutinize whether

30

assault and battery against a family member, in a vacuum, lands "within the ambit of a particularly serious crime." *Id.* (quoting *Annor v. Garland*, 95 F.4th 820, 827 (4th Cir. 2024)). Only if it does, the majority continues, can we finally turn to the individualized facts of the alien's crime. *Id.*

In other words, the majority endorses a confused form of the categorical approach, locking our ordinary totality-of-the-circumstances analysis behind a threshold inquiry into some vanilla violation of the statute underlying the alien's conviction. Of course the majority does not come right out and label its approach as categorical. But by forsaking a simple totality-of-the-circumstances test in favor of an initial inquiry into the elements of the offense, there is no other way to read it. If those "elements" fail to satisfy the majority's view of seriousness, that apparently would end the inquiry.

That makes little sense. Normally, "[t]he categorical approach serves 'practical' purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." *Moncrieffe v. Holder*, 569 U.S. 184, 200–01 (2013) (quoting *Chambers v. United States*, 555 U.S. 122, 125 (2009)). None of these benefits apply to the typical removal based on a particularly serious crime. For one thing, the IJ and BIA need only find that the alien was convicted of *one* particularly serious crime, as opposed to, say, *three* violent felonies. *See, e.g.*, *Taylor v. United States*, 495 U.S. 575, 600 (1990) (adopting the categorical approach to determine whether a crime counts as one of "three previous convictions . . . for a violent felony" in 18 U.S.C. § 924(e)). For another, the removal process almost always follows shortly after the alien

31

has been convicted of a particularly serious crime. Indeed, an alien's criminal conduct is often the impetus for the removal proceeding.

As an example, look no further than this very case: the IJ found particularly serious Guevara Martinez's conviction for assault and battery against a family member, doing so just eleven months after Guevara Martinez pleaded guilty. How exactly is the adjudicatory process made more efficient by forcing the agency to blind itself to the readily available facts of an alien's crime? Consider too that, under the majority's framework, the agency must *still* undergo a totality-of-the-circumstances analysis—but only after an academical inquiry into whether a run-of-the-mill breach of the criminal statute can, at some abstract level, be particularly serious. The practical justifications of the categorical approach, whatever their merits elsewhere, simply do not apply here.

Neither do the statutory justifications. Ordinarily, the categorical approach comes into play only where it has some basis in the text of the respective federal statute. *Contrast, e.g.*, *id.* at 600–01, *with Nijhawan v. Holder*, 557 U.S. 29, 37–40 (2009). Recall that the statute here requires asking whether "the alien, having been convicted by a final judgment of a particularly serious crime," poses "a danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). The two key considerations in this inquiry—seriousness of the crime and dangerousness to the community—are inherently unique to each petitioner.

Of course, Congress recognized that some crimes are so egregious that they are *per se* particularly serious. *Id.* §§ 1158(b)(2)(B), 1231(b)(3)(B); *see, e.g.*, *id.* § 1101(a)(43)(A) ("murder, rape, or sexual abuse of a minor"). But for everything else, the Immigration and

32

Nationality Act ("INA") leaves it up to the IJ and BIA to make the particularly serious crime determination on a case-by-case basis. Every regional circuit recognizes this basic structure. *See, e.g.*, *Lafortune v. Garland*, 110 F.4th 426, 432, 434–36 (1st Cir. 2024); *Garcia Pinach v. Bondi*, 147 F.4th 117, 135 n.7 (2d Cir. 2025); *Laureano v. Att'y Gen.*, 177 F.4th 453, 462–64 (3d Cir. 2026); *Gao*, 595 F.3d at 556–57; *Aviles-Tavera v. Garland*, 22 F.4th 478, 483 (5th Cir. 2022); *Reyes-Romero v. Barr*, 832 F. App'x 426, 429 (6th Cir. 2020); *Kithongo v. Garland*, 33 F.4th 451, 456 (7th Cir. 2022); *Shazi v. Wilkinson*, 988 F.3d 441, 449 (8th Cir. 2021); *Edgar G.C. v. Bondi*, 136 F.4th 832, 842 (9th Cir. 2025); *N-A-M v. Holder*, 587 F.3d 1052, 1056 (10th Cir. 2009) (per curiam); *K.Y. v. U.S. Att'y Gen.*, 43 F.4th 1175, 1187 (11th Cir. 2022) (per curiam).

Given the petition before us, such consensus is not hard to understand. If Guevara Martinez prevails in proving that his conviction is not within the so-called "ambit" of a particularly serious crime, Maj. Op. at 13, then Virginia assault and battery against a family member can *never* qualify as particularly serious. That type of categorical holding undermines the INA in at least two respects: it deprives the IJ and BIA of their roles as the initial triers of fact, and it negates the individualized inquiry that Congress intended when enacting § 1158(b)(2)(A)(ii) and § 1231(b)(3)(B)(ii).

It also undermines all common sense. Nobody thinks that crimes of domestic abuse can *never* be particularly serious, nor does anyone think that domestic abusers *never* pose a danger to the community. To so much as entertain the thought otherwise, as the majority does by remanding, does a disservice not just to Guevara Martinez's battered partner, but

33

also to the millions of victims of domestic violence. *See* FBI, *Domestic Relationships and Violent Crimes, 2020-2024*, at 5 (Feb. 2026).

Guevara Martinez takes things one step further, suggesting that *all* misdemeanors are not particularly serious absent exceptional circumstances. Opening Br. at 17–18. Such a sweeping generalization departs radically from the facts-and-circumstances inquiry that the INA demands. His argument is especially troublesome in the context of the domestic abuse seen here, which all too often goes undercharged as a "misdemeanor[] rather than [a] felon[y], notwithstanding the harmfulness of the[] [perpetrator's] conduct." *Voisine v. United States*, 579 U.S. 686, 689 (2016); *see, e.g.*, *United States v. Skoien*, 614 F.3d 638, 643 (7th Cir. 2010) (en banc) ("[M]any aggressors end up with no conviction, or a misdemeanor conviction, when similar violence against a stranger would produce a felony conviction.").

Rather than address these difficult points, the majority hides behind our decision in *Annor v. Garland*, 95 F.4th 820. There, the court invoked the threshold "ambit" inquiry for the first—and only—time, claiming it derived from the BIA's "established precedent" in *In re N-A-M-*, 24 I. & N. Dec. 336 (BIA 2007). *Annor*, 95 F.4th at 827. Query at the outset why we would accept without question an agency's reading of a federal statute. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Query also why *Annor* insufficiently engaged with the Fourth Circuit case law, both before and after *In re N-A-M-*, that applied a simple totality-of-the-circumstances analysis. *E.g.*, *Yousefi v. INS*, 260 F.3d 318, 328 (4th Cir. 2001) (per curiam); *Gao*, 595 F.3d at 557.

34

The majority has lost the forest for the trees. Just look at the factual inquiry the INA points us to: Do not apply an inapplicable, categorical-sounding criterion, which in effect adds per se offenses that Congress did not enumerate. Look instead at Guevara Martinez's individual circumstances, not those of some other hypothetical person somewhere yonder. Once again, Guevara Martinez brutally attacked and bruised his partner while repeatedly barring her from seeking assistance.

### III.

Guevara Martinez rests his case on a chain of tall tales, each contradicted on its face and by independent evidence. Concluding as much, the IJ and BIA denied asylum and explained that his conviction for violently assaulting, threatening, and silencing his partner disqualified him from relief regardless. Rather than respect these ready findings, the majority misconstrues the good work of the IJ and BIA and then criticizes them for errors they did not commit. In the process, it merely stalls what we all know is inevitable: Guevara Martinez will be denied asylum and withholding of removal. The INA does not reward testimony that bears no discernable relationship to truth, and neither should we.